**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**AARON C. ROONEY** **PLAINTIFF**

**V.** **CASE NO. 5:15-CV-05198**

**ROCK-TENN CONVERTING COMPANY,
ROCK-TENN SERVICES, INC., and
WESTROCK COMPANY** **DEFENDANTS**

# MEMORANDUM OPINION AND ORDER

Currently before the Court is a Motion for Summary Judgment (Doc. 16) filed by Rock-Tenn Converting Company, Rock-Tenn Services, Inc., and Westrock Company (collectively, "Rock-Tenn"). Plaintiff Aaron C. Rooney has filed a Response (Doc. 20) in opposition to the Motion, to which Rock-Tenn has filed a Reply (Doc. 21). For the reasons stated herein, Rock-Tenn's Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

On March 22, 2010, Rooney, a Christian male, was hired by Dean Metter, a Jewish male, to work for Rock-Tenn as an account executive out of the company's Bentonville, Arkansas office. Rooney was hired from a relatively large pool of candidates—somewhere between 29 and 35 individuals who applied for the job.[1] Rooney admits that during the interview process, his religious affiliation was never mentioned. For approximately the first three years of Rooney's employment with Rock-Tenn, he reported directly to Metter, who worked out of the Philadelphia, Pennsylvania office.

[1] The exact number of candidates is irrelevant for purposes of summary judgment.

By the summer of 2013, there were four employees working in the Bentonville office, including Rooney. One of the four employees reported directly to Rooney, one reported to a supervisor located in the New Jersey office, and Rooney reported to Metter in Pennsylvania. During the fall of 2013, Metter hired Nancy Collom to serve as Sales Director of Rock-Tenn's Bentonville office. At the time Rooney first met Collom, Metter described her as a "nice Jewish lady from Philadelphia."[2] (Doc. 1, p. 3). Rooney admits that when he learned he would have to begin reporting to Collom as his local supervisor, he "had mixed feelings about it," mainly because he understood Collom would likely take over all prospective business with Walmart, a client with whom Rooney had already developed significant contacts. (Doc. 15-5, p. 11). Rooney admitted in his deposition that he did not like the fact that he was directed to report to Collom instead of Metter. *Id.*

Rooney claims that shortly after Collom began working in the Bentonville office, she began making comments to Rooney that he considered to be sexist. The comments included: "I can't wait until we have more women in these desks"; "I can't wait until there are more ladies in the office"; "Now we have just as many women in the office as men"; and "Now the ladies overpower the men." (Doc. 1, pp. 3-4; Doc. 20, p. 9). He also alleges that Collom went out to lunch with women in the office, and Rooney was not invited. Rooney admits that Metter had no animus towards him because of his gender, but

---

[2] Metter testified that he never said this, *see* Doc. 15-2, p. 21; and Collum testified that, although she is ethnically Jewish, she has not observed the Jewish faith since she was twelve years old, she is married to a Christian man, and she is raising her children in the Christian faith, *see* Doc. 15-6, p. 18. For purposes of summary judgment, however, the Court will assume that Metter actually made this statement to Rooney.

speculates that Metter was likely the "cat's paw" for Collom to further her personal desire to increase the number of women in the office by discriminating against men.[3]

Rooney also claims that another reason Metter fired him was that Rooney was not Jewish. Rooney testified that Metter told him he was "going to have to start learning to take direction from a Jewish woman," meaning Collom, in October of 2013. (Doc. 15-5, p. 29). Further, it was Rooney's view that Metter had a "resurgence in his Jewish beliefs" and expressed in September of 2013 a desire to "tap into the Jewish network" at Walmart. *Id.* at p. 30. In addition, another employee told Rooney that Metter "felt more comfortable . . . working with people who go to church on Saturday." *Id.* at p. 31. Rooney believes he was terminated so that Mark Benjamin, a Jewish employee who was already working at Rock-Tenn, could take over Rooney's accounts. *Id.* at p. 32.

Rooney was fired by Metter on February 5, 2015. Rooney filed a charge of discrimination based on religion and gender with the United States Equal Opportunity Commission on May 4, 2015. He received his Right to Sue letter on June 30, 2015, and he filed a Complaint in this Court on August 20, 2015. Rock-Tenn filed its Motion for Summary Judgment on June 10, 2016, after the parties engaged in discovery.

---

[3] Under a cat's paw theory, "if a non-decisionmaker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer has cat's paw liability." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045 (8th Cir. 2011) (en banc) (citing *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1194 (2011)). The theory turns on having the decisionmaker serve as "the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006) (quotation and citation omitted).

## II. LEGAL STANDARD

When a motion for summary judgment is filed, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (quoting Fed. R. Civ. P. 56(c)). The Court must review the facts in the light most favorable to the non-moving party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997).

"While employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment, and there is no separate summary judgment standard for employment discrimination cases." *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010). A plaintiff can survive summary judgment on a discrimination claim "either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination" using circumstantial evidence. *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012). When a plaintiff relies on circumstantial evidence to prove discrimination based on disparate treatment, the claim is analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Gray v. Univ. of Ark. at Fayetteville*, 883 F.2d 1394, 1398 (8th Cir. 1989) (applying the *McDonnell Douglas* model to a gender discrimination claim); *Shirrell v. St.*

*Francis Med. Ctr.*, 793 F.3d 881, 885 (8th Cir. 2015) (applying the *McDonnell Douglas* model to a religious discrimination claim).

Under the burden-shifting framework, the employee must first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. A minimal evidentiary showing will satisfy this burden. *Johnson v. Ark. State Police*, 10 F.3d 547, 551 (8th Cir. 1993). Once the employee meets it, a presumption of discrimination is created. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden then shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment actions taken. *McDonnell Douglas*, 411 U.S. at 802. "Once the employer's burden is met, the presumption of discrimination disappears, and the employee must prove that the proffered justification is merely a pretext for discrimination." *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005) (citing *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)). "At all times, the burden of persuasion remains with the plaintiff." *Id.* (citing *Gagnon v. Sprint Corp.*, 284 F.3d 839, 847 (8th Cir. 2002)).

## III. DISCUSSION

### A. Prima Facie Case

To establish a prima facie case based on either gender or religious discrimination, Rooney must show that: (1) he is a member of a protected class; (2) he met Rock-Tenn's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *See Shirrell*, 793 F.3d at 887 (religious discrimination); *Holland v. Sam's Club*, 487 F.3d 641, 644-45 (8th Cir. 2006)

(gender discrimination). There is no dispute that Rooney was discharged, so the third element of the test has been met for each of Rooney's discrimination claims.

**1. Rooney is a Member of a Protected Class**

Because Rooney is a Christian male, to establish the first prong of his prima facie case he must show that background circumstances support the suspicion that Rock-Tenn is "the unusual employer who discriminates against the majority." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 875 (8th Cir. 2007). In *Duffy v. Wolle*, the Eighth Circuit found that a male plaintiff presented a prima facie case of gender discrimination when he alleged: (1) that a female who had been promoted was substantially less qualified than he was, (2) that a member of the hiring panel had mentioned that the employer was interested in hiring a female for the job, and (3) that two members of the hiring panel had "usually" hired females in the past. 123 F.3d 1026, 1037 (8th Cir. 1997), *abrogated on other grounds by Torgerson*, 643 F.3d at 1059. These background circumstances were enough, in the *Duffy* Court's view, to support the suspicion that the employer was the "unusual employer" who discriminated against men. *Id.*

The Court now turns to Rooney's allegation that Rock-Tenn was also the unusual employer that engaged in reverse discrimination. He claims, with respect to religious discrimination, that Metter intentionally structured his division of the company he supervised so that his direct reports were mostly Jewish. According to Rooney, four of the seven people who reported to Metter at the time Rooney was fired were Jewish. Rooney also points out that Metter placed Rooney under the supervision of Collom, who is ethnically Jewish. In Rooney's view, "the composition of [Metter's] organization simply

makes it more likely than not that he would discriminate against someone who is not Jewish." (Doc. 20, pp. 5-6).

As for Rooney's allegations of gender discrimination in the workplace, he contends that Collom, acting as the cat's paw to Metter, put into effect her own unwritten affirmative action plan, with the goal of hiring more women than men. He claims she actually did this, and further, that she banished him from the office and had him work on his accounts from home simply because he is a male. (Doc. 20, pp. 6-7).

Considering the minimal evidentiary showing required to satisfy the burden of the prima facie case, the Court finds that Rooney has shown sufficient background circumstances to support a suspicion that Rock-Tenn is the unusual employer who discriminates against both males and Christians. Although his allegations are composed mainly of speculation and innuendo, the Court will consider that he has met the first prong of his prima facie case, both as to his religion and gender claims.

**2. Rooney Was Meeting Rock-Tenn's Legitimate Expectations**

To establish that Rooney was meeting Rock-Tenn's reasonable expectations at the time he was terminated, Rooney need only show that he was qualified for the position at that time. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 469-70 (8th Cir. 2011). In *McGinnis v. Union Pacific Railroad*, the Eighth Circuit held that "[u]nder the qualification prong, 'a plaintiff must show only that he possesses the basic skills necessary for performance of the job,' not that he was doing it satisfactorily." 496 F.3d 868, 874 n.2 (8th Cir. 2007) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)). Otherwise, the plaintiff would be required to "disprove the reasons given for the discharge

during his prima facie case, short circuiting the analysis under *McDonnell Douglas*." *Haigh*, 632 F.3d at 470 (citing *McGinnis*, 496 F.3d at 875 n.3). Notably, "'where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw.'" *McGinnis*, 496 F.3d at 874 n.2 (quoting *Slattery*, 248 F.3d at 92).

Here, Rooney worked as an account executive for Rock-Tenn for nearly five years before he was terminated. (Doc. 20, p. 4). Moreover, when Rooney was initially hired, Metter chose him from a pool of up to 35 candidates. Thus, the inference of minimal qualification is easy to draw because Rooney was hired by Rock-Tenn and subsequently worked as an account executive for nearly five years before being fired. Accordingly, the Court considers the second prong of Rooney's prima facie case to have been met, as to both claims.

**3. Circumstances Giving Rise to an Inference of Discrimination**

The final prong of the prima facie case requires the employee to show circumstances that give rise to an inference of discrimination. This prong is somewhat redundant in a reverse discrimination case, as the burden of proof already requires an additional showing of background circumstances sufficient to indicate the employer is unusual in that it discriminates against the majority. Nevertheless, since Rooney has alleged certain other facts the Court has not yet discussed and that bear on the inference of discrimination, they will be discussed below.

For his religious discrimination claim, Rooney alleges that the jury could infer that he was fired for not being Jewish because Metter's Jewish faith was particularly strong, and

that faith was allegedly rejuvenated after Metter was introduced to a Holocaust survivor in 2013, an incident that Metter relayed to Rooney. (Doc. 20, p. 7). Rooney further alleges that as a result of Metter's revived faith, it became his mission to help his fellow Jewish employees at Rock-Tenn, which resulted in decisions to transfer one Jewish employee to another office instead of firing him, plead for a different Jewish employee's job even though the employee was undeserving, and protect Collom from firing in spite of employee complaints about her. *Id.* at pp. 7-8. For his gender discrimination claim, Rooney alleges that Collom regularly made passive-aggressive, sexist comments to Rooney, that Collom told Rooney he was being removed from a project with Wal-Mart because the contact at Wal-Mart was a lesbian and would feel more comfortable working with women, and that Collom banished Rooney to work at home simply because he was male. *Id.* at p. 9. Considering the facts alleged, the Court finds that Rooney has met the final prong of the prima facie test as to both claims, and the burden of proof now switches to Rock-Tenn to show its legitimate, non-discriminatory reasons for firing him.

**B. Legitimate, Non-Discriminatory Reasons for Adverse Action**

The prima facie case raises only the inference that discriminatory conduct has, in fact, occurred. The burden of proof rests with the employer to offer legitimate, non-discriminatory reasons for firing the employee. *McDonnell Douglas*, 411 U.S. at 802. In proffering these justifications for its decisionmaking, "the defendant's explanation of its legitimate reasons must be clear and reasonably specific." *Burdine*, 450 U.S. at 258. "The critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was

guilty of the conduct justifying discharge." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861-62 (8th Cir. 2009) (internal citations omitted). The Court will therefore consider whether there is any genuine, material question of fact about Metter's and Collom's good faith belief that Rooney's conduct warranted firing.

Rock-Tenn clearly and specifically articulates a number of reasons for Rooney's discharge, with the main reason being Metter's belief that Rooney's performance was poor. Rooney worked for Rock-Tenn for nearly five years between 2010 and 2015. Metter conducted an evaluation ("Performance Review") of Rooney's work from October 1, 2012 to September 30, 2013. *See* Doc. 15-3, pp. 15-17. Rooney agrees that In 5 out of 10 competencies, he scored a "2" on a scale of "1" to "4," with "4" being an "outstanding performer." *Id.* In the Performance Review, Metter described Rooney as having a "lack of communication" and "behavior that is not within our acceptable level." *Id.* at p. 16. He also noted that Rooney was "[c]onfrontational with new Bentonville sales director [Collom]." *Id.* Rooney admitted in the employee "Comments" section of the Performance Review that he had, indeed, "failed to keep DPSG NWA/Leah Back as a RTMD customer" and that this "was regrettably a mark against [his] overall level of customer satisfaction." *Id.* Metter further noted in the Performance Evaluation that over the previous seven weeks, Rooney "worked in a bubble and has not collaborated with his office team members" and "fights the new office alignment." *Id.*

In April and September of 2014, Metter received emailed complaints from Collom about Rooney's absence from the office. *See* Doc. 15-3, p. 18 ("Please communicate your schedule as requested please."); *id.* at p. 19 ("Did I miss an email or phone call that you

would be out this afternoon? One thing that I have asked is that out of respect for the people you work with that if you are going to be out that you let us know . . . Please let me know where you were this afternoon?"); *id.* at p. 21 ("Tracy from [W]inston and Kristen have been trying to get ahold of you all afternoon since you didn't return from lunch with Matt. Please reach out to both of them.").

Then, in the summer of 2014, Metter began receiving complaints from Rock-Tenn's customers regarding accounts and projects that Rooney was involved in. Problems with Rooney's main account, Alcon, started surfacing in late June and July of 2014 when Alcon completed a customer satisfaction survey. In August of 2014, Metter wrote an email to his own supervisor, Timothy Sullivan, assessing the staff of the Bentonville office, and labeling the assessment as "confidential." *Id.* at p. 41. In the email, Metter summarized the performance of each staffmember, and particularly described Rooney as "lazy," "lack[ing] desire to help grow the local marketplace," and "severely lacking" in internal communication skills. *Id.* Metter told Sullivan that Rooney "should be replaced because of attitude . . . ." *Id.* Metter also relayed Alcon's concerns about improving Rock-Tenn's service in an email to Rooney, Collom, and Sullivan, ultimately laying the blame for certain errors at Rooney's feet for not "follow[ing] up per Ashley's[4] request." *Id.* at pp. 39-40.

Alcon again complained about the servicing of its account between September 23 and 28, 2014. *Id.* at p. 62. The Head of Marketing for Alcon, Shawn Millerick, wrote an email complaining about Rock-Tenn's responsiveness: "This is not acceptable. We need requests returned promptly. Please let me know the status of this and planned resolution."

[4]The "Ashley" identified in this email is Ashley Olson, Manager of Displays and Special Packs at Alcon and liaison between Alcon and Rock-Tenn.

*Id.* More complaints followed, addressed to Rooney, as account manager for Alcon, and Metter, as Rooney's supervisor, from Alcon's Ashley Olson: "As you are aware, we have had multiple QA issues over the past couple of months which have caused delays to Walmart. These costs have continued to grow . . . . We are looking to have these fees/fines reimbursed by Rock Tenn since these were QA issues that were the responsibility of Rock Tenn." *Id.* at pp. 80-81.

Rock-Tenn deposed Damara Lynn Davidson, senior manager of visual merchandising for health and wellness at Walmart, Rock-Tenn's customer. Davidson testified that she had worked with Rooney at Rock-Tenn for about three years. (Doc. 15-8, p. 4). She further testified that on one occasion, she became concerned that Walmart would not receive a timely delivery of materials from Rock-Tenn, and after communicating with Rooney unsuccessfully, she asked Metter for assistance to help make sure the deadline was met. *Id.* at p. 6. She stated, "it didn't feel like [Rooney] was going to deliver on time or it was going to be late." *Id.*

Another client-representative of Rock-Tenn's, Ashley Olson, was also deposed in this case. Olson characterized her working relationship with Rooney, on behalf of Alcon, as follows: "He was not very responsive and very slow to meet our needs. I would have to ask for requests multiple times. Whenever I felt things were moving slowly, I would ask—sometimes two or three times a day. I did not feel the responsiveness was fast enough to satisfy our needs." (Doc. 15-9, p. 7). She testified that Eric Beams replaced Rooney as Alcon account manager when Rooney was terminated, noting that she and Alcon "were dissatisfied with Aaron's performance." *Id.*

As for allegations that Rooney was replaced by females and/or persons of the Jewish faith, Rock-Tenn clarifies—and Rooney does not disagree—that Beams, a Christian male, took over Rooney's Alcon account. Beams was not a new hire, but was already working at Rock-Tenn. Other accounts formerly managed by Rooney were also redistributed to existing Rock-Tenn employees, in particular to Danielle Vaughan, a Christian female, and to Mark Benjamin, a Jewish male.

In sum, Rock-Tenn has offered numerous legitimate nondiscriminatory reasons for Rooney's discharge, including poor performance, customer complaints, and negative interactions with co-workers. Accordingly, Rock-Tenn has met its burden of refuting Rooney's prima facie case with respect to the inferences of gender and religious discrimination, and the burden now shifts to Rooney to show that the reasons offered by Rock-Tenn were mere pretext for intentional discrimination.

**C. Pretext**

To avoid summary judgment, Rooney must meet proof with proof and present evidence that creates a genuine dispute of material fact as to whether Rock-Tenn's proffered reasons for discharging him were pretextual. *Torgerson*, 643 F.3d at 1046. "One method of proving pretext is to show that the employer's proffered explanation has no basis in fact." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (internal quotation and citation omitted).

Rooney offers excuses and explanations in an attempt to mitigate what he recognizes is a thorough record of questionable work performance. *See* Doc. 20, p. 16 ("While Rooney concedes that RockTenn has some arrows in its quiver of evidence . . .").

Rooney disagrees with Rock-Tenn's ultimate assessment of him as a poor worker, and he blames others for his alleged communication issues or for problems that might have arisen with respect to servicing his clients, particularly Alcon. However, the critical issue to focus on here is *not* whether Rooney was actually lazy, a poor communicator, or solely to blame for his client's complaints. Instead, the pretext question concerns whether Rock-Tenn, and specifically Metter and Collom, genuinely believed that Rooney's performance was poor and that his poor performance warranted termination. To prove pretext then, Rooney must "show a genuine issue for trial about whether [Rock-Tenn] acted based on an intent to discriminate rather than on a good-faith belief that Rooney committed misconduct . . . ." *McCullough*, 559 at 862 (citing *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 811 (8th Cir. 2005)).

In reviewing Rooney's arguments as to pretext, the Court finds he has failed to establish any triable issue of fact to indicate that Metter and/or Collom acted with the intent to discriminate against him. Beginning with Metter, the fact that he is Jewish and at various times discussed his faith with Rooney and others is of no moment. Metter documented Rooney's unsatisfactory workplace performance for years prior to finally firing him. The fact that Metter hired both Christians and Jews to work for Rock-Tenn does not lead to an inference of discriminatory animus against Rooney, particularly in light of Rooney's poor performance on the job. Rooney also cannot establish that he was replaced by a Jewish person after he was fired; instead, his accounts were merely redistributed among three or four existing employees, including men, women, Christians, and Jews.

With respect to allegations of gender discrimination by Collom, her alleged statements about how she could not wait to have "more women in these desks," "more

ladies in the office," or "just as many women in the office as men" are not such as to "cause a reasonable trier of fact to raise an eyebrow." *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922-23 (8th Cir. 2000). Furthermore, it takes *chutzpah* for Rooney to complain that he was never invited to lunch with the ladies, and somehow construe this fact as evidence of gender discrimination in the workplace. Finally, Rooney's cat's paw theory lacks teeth. He has provided no evidence to support his bare speculation that Metter's termination decision was simply a rubber-stamp of Collom's unlawful desire to fire him due to his gender. *See* Doc. 20, p. 6 (admitting that "[p]erhaps Metter had no animus toward Rooney because of Rooney's sex, but he *likely* was the 'cat's paw' for Collom's desire to have an office dominated by females"(emphasis added)). Since Rooney has failed to meet his burden of showing of pretext, his case must be dismissed on summary judgment.

## IV. CONCLUSION

For the reasons described herein, Defendant Rock-Tenn's Motion for Summary Judgment (Doc. 16) is **GRANTED**, and this case is **DISMISSED WITH PREJUDICE**. Final judgment will be entered today.

**IT IS SO ORDERED** on this 2nd day of August, 2016.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE